UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEVEN ZIELINSKI and NANCY DOYLE | : | |
| Plaintiffs | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:06-cv-1364 (JCH) |
| | : | |
| ROBERT E. HEINEMANN | : | MAY 21, 2008 |
| Defendant | : | |

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Doc. No. 46]**

This is an action, premised on diversity of citizenship, that arises out of a purported oral contract. Plaintiffs Steven Zielinski and Nancy Doyle are former employees of a company called TyMetrix, Inc. Zielinski and Doyle had been with the company since its early days as a start-up, and they maintain that TyMetrix's initial owner, defendant Robert E. Heinemann, promised to give each of them $1 Million dollars if he ever sold TyMetrix. Heinemann subsequently sold the company for a large sum. However, the plaintiffs never received the promised payments. Thus, they have brought this action asserting claims for breach of contract, promissory estoppel, and fraud. Heinemann has filed a Motion for Summary Judgment. See Doc. No. 46. For the reasons that follow, the Motion is **GRANTED IN PART AND DENIED IN PART**.

**I.     STANDARD OF REVIEW**

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000). Once the

1

moving party has met its burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor in order to defeat the motion. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38. "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000). "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury. Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

## II.    FACTUAL BACKGROUND[1]

In 1984, Heinemann founded a company called Learning Dynamics. Heinemann Dep. at 17. The company did various work related to management development, and for the first 10 years of its existence, the company was quite small. Indeed, by 1994 Learning Dynamics had only three or four employees, and Heinemann was the company's only shareholder. Id. at 18.

At some point in 1994, Heinemann was approached by the general counsel at The Hartford Insurance Group ("The Hartford"). Id. at 18-19. The Hartford's general

---

[1] For the purposes of the instant motion, the court accepts facts undisputed by the parties as true and resolves disputed facts in favor of the plaintiffs where there is evidence to support their allegations.

counsel explained to Heinemann that The Hartford was having difficulty managing its flow of legal bills from work it gave to law firms. Id. Heinemann ultimately agreed to develop computer software to aid The Hartford in this task. Id. at 25, 27.

Heinemann started out by hiring Jane Bennitt to work with him, and Bennitt initially performed a number of roles related to developing and implementing the software. Bennitt Dep. at 10, 16. Plaintiff Zielinski was hired to work for Learning Dynamics in 1996. Zielinski Dep. at 42. In the beginning, Zielinski did not have a formal job title, and his job involved "a little bit of everything." Id. at 51. However, one of his main tasks was to assist Bennitt in traveling to law firms all around the country, and helping those firms implement the software. Zielinski also helped "create a system by which law firms could send in their legal bills electronically and then make sure that they were [later] readable and accessible." Id. Zielinski did not do any programming work. Id. at 52. His starting salary was $42,000 a year.

Plaintiff Doyle was also first hired in 1996 to work on Heinemann's software project.[2] Doyle Dep. at 25. Initially, she did a variety of tasks, including help desk work, software testing, and training employees on how to use the software. Id. Her starting salary was $30,000 a year.

In the Fall of 1997, Heinemann officially formed TyMetrix, Heinemann Dep. at 27, and Doyle and Zielinski were among the first people to work for TyMetrix. Over several years, Heinemann's software proved successful. Id. at 54. Indeed, TyMetrix soon

---

[2] Doyle was not directly hired by Learning Dynamics. Instead, she was hired by a related company, and she worked at that related company for two years before she was formally hired by TyMetrix. Doyle Dep. at 25.

expanded well beyond The Hartford, and it began handling legal-billing work for a number of other companies.  Id. at 54-57.

During TyMetrix's early years, a number of its employees, including Zielinski and Doyle, were putting in long hours at their jobs.  Bennitt Dep. at 65-67; Zielinkski Dep. at 138; Doyle Dep. at 120.  These employees were working sixty-hour weeks, including night and weekend work, and they were doing whatever was needed to get the job done.  Bennitt Dep. at 65-67; Zielinkski Dep. at 138; Doyle Dep. at 120.  By working these long hours, the employees made sacrifices in their personal lives so that the company could succeed.  Doyle Dep. at 120, Zielinski Dep. at 138.  Indeed, in TyMetrix's early days, people at the company had a real sense of excitement that they were growing the company for themselves, and that they were going to sacrifice in the present in order to reap the benefits down the line.  Syzmonik Dep. at 14.  That was an atmosphere Heinemann tried to foster through the attitude that he took as the company leader.  Id. at 14-15.

The plaintiffs believe Heinemann did more than simply foster this view with his attitude and outlook.  Instead, the plaintiffs believe that Heinemann explicitly promised them that they would become rich if the company succeeded.

According to Zielinski, he once sat down with Heinemann after his first performance review.  Zielinski explained to Heinemann that at the time the company did not have any life insurance plan, or any retirement plan, and thus Zielinski was beginning to worry about his future financial security.  Zielinski Dep. at 98.  Zielinski asked if there was anything that could be done to start up a retirement plan.  Id.  Heinemann responded by telling Zielinski not to "worry about it" because "when I sell

the company . . . you will have enough for retirement. There will be a million dollars there for you." Id. Zielinkski maintains that Heinemann made this million dollar promise to him individually on numerous other occasions. Zielinski further maintains that this promise was made to him and others (including Bennitt and Doyle) during group meetings, and during an office Christmas party. Id.

Doyle's recollection was slightly different. According to her, Heinemann never actually told her that if TyMetrix was sold she would get a million dollars. Doyle Dep. at 99. However, she does recall Heineman telling her and others, numerous times, that he would make them millionaires. Id. She also recalls that on another occasion, at a company luncheon, Heinemann told a group of employees (which included her) that on the sale of the company they "would be very well taken care of" and they "didn't have anything to worry about." Id. at 103.[3]

Zielinski contends that he relied on what he termed Heinemann's "gentleman's agreement." Zielinski Dep at 117. In particular, on several occasions Zielinski was approached by headhunters about various employment opportunities. Zielinski claims he declined to pursue these opportunities because of Heinemann's promise. Id. at 134. There is no evidence that Doyle similarly chose to forgo employment opportunities in reliance on Heinemann's statements, and it is not entirely clear whether Doyle relied on Heinemann's promises at all. There is evidence that Doyle, like Zielinski, did not question the sincerity of Heinemann's promise: she believed that Heinemann was "a

---

[3] Heinemann, for his part, denies ever telling any employee that he would give them a million dollars if he sold TyMetrix. Heinemann Dep. at 164-66. Heinemann does recall having suggested to various employees that if they worked hard, TyMetrix would do well. Id. at 166.

man of his word" and was someone who "always followed through on everything he said." Doyle Dep. at 152.

In late 2002, all of the company's employees, including Zielinski and Doyle, were presented with written employment contracts.[4] By its terms, these employment contracts were entered into between each of the plaintiffs and TyMetrix, Inc. Zielinski and Doyle each signed a contract, and Heinemann signed both of their contracts in his capacity as President of TyMetrix. Plaintiffs' Exh. 6, Plaintiffs' Exh. 7. Both agreements contained integration clauses that read as follows:

> This Agreement contains the entire agreement between the parties relating to the subject matter hereof and supersedes all previous agreements between the parties, whether written or oral, with respect to the subject matter hereof. This Agreement cannot be modified, altered[,] or amended except by a writing signed by the party to be bound thereby.

Plaintiffs' Exh. 6, Plaintiffs' Exh. 7. Both before and after signing their agreements, Zielinski and Doyle were at-will employees.

On Friday August 29, 2003, Heinemann sold TyMetrix to another company, CT Corporation System, for a substantial amount of money. Heinemann broke the news to TyMetrix's employees on the following business day, which was September 2, 2003 (the day after Labor Day). Heinemann Dep. at 94. In doing so, Heinemann did not inform all of TyMertix's employees simultaneously. Instead, he first had a meeting with the small group of six to eight people who had been TyMetrix's earliest employees – a group that included Bennitt, Doyle, and Zielinski. Id. at 98-99. That meeting was

---

[4] Prior to that time, they (and presumably most or all of the other TyMetrix employees) had not had formal written contracts.

relatively short, lasting 15-20 minutes, and Heinemann spent the time thanking everyone for all the hard work they put in. Zielinski Dep. at 90-91. Next, Heinemann had a meeting with the high-level employees who held various stock options in the company. Heinemann Dep. at 95. At that meeting, Heinemann explained to the options holders that they would be receiving a payout for their options in their next paychecks. Id. Finally, Heinemann held a company wide meeting. Syzmonik Dep. at 28.

Zielinski and Doyle never received any million dollar payment from Heinemann, nor did Bennitt or any of the other people to whom the million dollar promise had been made. Several weeks after the sale, however, Bennitt learned about the special payments made to the options holders in senior management. Bennitt Dep. at 59. Bennitt confronted Heinemann about the fact that, in contrast to the senior managers, she and the other original employees had not received any payments following TyMetrix's sale. Heinemann's response was that "he felt he rewarded the people who deserved to be rewarded" and that the rest of the employees "were compensated in terms of salary and bonuses, and the fact that he had a chosen a buyer for the company who . . . had promised to keep it in Hartford." Id. at 60.

Zielinski and Doyle filed their initial Complaint in this action on August 31, 2006. See Doc. No. 1. The operative Complaint is now the plaintiffs' Third Amended Complaint. See Doc. No. 24. Under this Complaint, Heinemann is the sole named defendant.[5] Plaintiffs principally allege three claims, all of which arise under

---

[5] In earlier Complaints, TyMetrix had also been named as a defendant. However, TyMetrix's presence in the case destroyed complete diversity, and so the

7

Connecticut law: an action for breach of contract, an action for promissory estoppel, and an action for common law fraud.[6]  See id.  Heineman has filed a Motion for Summary Judgment on all three claims.  See Doc. No. 24.

III.   ANALYSIS

    A.   Breach of Contract

The plaintiffs first press a straightforward claim for breach of contract.  In their view, they each had a contract with Heinemann in which he had promised to pay them $1 Million dollars in exchange for their hard work for TyMetrix.

In Connecticut, an agreement is not enforceable as a contract unless its terms are definite and certain.  Suffield Dev. Assocs. Ltd. P'ship v. Soc'y for Sav., 708 A.2d 1361, 1366 (Conn. 1998).  This is not to say that a contract needs to contain all terms, as an agreement can be enforceable despite the fact that it fails to deal with certain issues.  See Glazer v. Dress Barn, Inc., 873 A.2d 929, 943 (Conn. 2005).  However, a contract cannot be enforced unless all essential terms have been sufficiently agreed upon.  Id. at 943-44 & n.16; Suffield Dev., 708 A.2d at 1366.

In this case, the purported agreement is simply too indefinite to be enforceable. That is because the agreement is highly ambiguous with regard to an essential term:

---

plaintiffs' current Complaint does not name TyMetrix as a defendant.  The court treats TyMetrix as having been dropped as party under Fed. R. Civ. P. 21, and for purposes of diversity jurisdiction, this means that the court treats the case as though complete diversity had existed from the outset.  See Le Blanc v. Cleveland, 248 F.3d 95, 99 (2d Cir. 2001) (per curiam).

    [6] The Complaint also contains two other causes of action: a claim for negligent misrepresentation, and a claim for unpaid wages under Conn. Gen. Stat. §§ 31-71 et seq.  The plaintiffs have now agreed to withdraw these claims.  See Plaintiffs' Opposition to Summary Judgment at 2 n.2.

the consideration that plaintiffs were to provide in exchange for the million dollars. Indeed, the agreement simply fails to explain what the plaintiffs were promising to give Heinemann. Were they agreeing simply to continue working at TyMetrix for a reasonably long period of time? Were they instead agreeing to work at TyMetrix until the company was sold? Were they committing to work at a particular effort level? If so, what was the effort level? And how long were they expected to provide that effort level? The agreement is silent as to all of these issues.[7]

Notwithstanding the vague nature of the agreement, the plaintiffs point to the fact that they remained employed by TyMetrix up until the sale, and that they worked hard to help make the company a success. Plaintiff's Opposition to Summary Judgment at 24-25. The plaintiffs appear to be arguing that the extent of their contractual obligations can be inferred from circumstances.

Connecticut courts have found contracts to be enforceable when missing terms can be determined "by fair implication." Presidential Capital, 652 A.2d at 508. Even when an agreement is initially unenforceable because of its indefiniteness, the agreement may later become binding if a party makes his promise more definite through complete or partial performance. Augeri v. C.F. Wooding Co., 378 A.2d 538, 540 (Conn. 1977). However, a party's performance cannot help fill in gaps when the

---

[7] Nor is this a scenario in which there are surrounding contract negotiations that can assist the fact finder by giving context to the agreement. Cf. Presidential Capital Corp. v. Reale, 652 A.2d 489, 507-08 (Conn. 1994) (looking at the pre-contract bargaining between the parties to help give context to an otherwise vague agreement). Indeed, at his deposition, Zielinski was asked if he had bargained with Heinemann at all for the million dollar promise. Zielinski's response was "[n]o. It came free and natural from [Heinemann] over and over again, privately and in groups." Zielinski Dep. at 132.

essential terms of a contract were never actually agreed to in the first place. See Geary v. Wentworth Labs., Inc., 760 A.2d 969, 973 (Conn. App. Ct. 2000). Here, there is no indication that the parties mutually assented to any specific consideration for the million dollar promise; the fact that Zielinski and Doyle worked hard for TyMetrix is not enough to make the agreement enforceable.

Summary judgment is appropriate for the plaintiffs' breach of contract claims.

B. Promissory Estoppel

The plaintiffs' second claim asserts a theory of promissory estoppel. To be successful on this claim, each plaintiff must show that (1) the defendant made a clear and definite promise; (2) the promisor could reasonably expect that his promise would induce reliance by the promisee; (3) the promise does in fact induce reliance by the promisee; and (4) the enforcement of the promise is necessary to avoid injustice. Stewart v. Cendant Mobility Servs., 837 A.2d 736, 742 (Conn. 2003); Restatement (Second) of Contracts § 90 (1981).

Heinemann first argues that the plaintiffs' promissory estoppel claim is barred by the statute of limitations. Because promissory estoppel claims sound in contract, they are subject to the same statutes of limitation that govern ordinary contract actions. Torringford Farms Ass'n v. City of Torrington, 816 A.2d 736, 738, 741 (Conn. App. Ct. 2003). Heinemann therefore asks this court to apply Connecticut's three-year statute of limitations for breach of an oral contract. See Conn. Gen. Stat. § 52-581(a). Heinemann points out that the plaintiffs filed suit on August 31, 2006, more than three years after TyMetrix's August 29, 2003, sale date.

Even assuming that Heinemann correctly invokes the three-year limitations

10

period under Conn. Gen. Stat. § 52-581(a), rather than the longer limitations period that arguably applies to this case under Conn. Gen. Stat. § 52-576(a),[8] his argument fails. For statute of limitations purposes, a cause of action does not accrue until a plaintiff is first able to maintain an action against the defendant. Engleman v. Conn. Gen. Life Ins. Co., 690 A.2d 882, 886 n.7 (Conn. 1997). In a contract action, where the defendant is claimed to have broken his promise to pay a sum of money, the cause of action therefore does not accrue until the defendant fails to pay the promised sum. Id. Accordingly, the plaintiffs' cause of action did not accrue at the moment of TyMetrix's sale unless that moment was also the moment at which Heinemann was required to physically deliver $1 million dollars to each plaintiff.

It is plain that Heinemann's promises did not obligate him to commence an instantaneous transfer of funds to the plaintiffs. In making his various promises, Heinemann never provided a specific time at which he would physically deliver checks to Zielinski and Doyle. Instead, he vaguely told them that they would get the money sometime after he sold the company. In this case, a jury could determine that Heinemann's promise did not require him to deliver checks to Zielinski and Doyle on the same day he closed the sale of TyMetrix. Instead, the jury could conclude that Heinemann was only required to pay the plaintiffs within a "reasonable" time after the sale was completed – a period of time that surely extended to at least the first business

---

[8] The plaintiffs argue that the three year limitations period applies only to executory oral contracts, and that a six year statute of limitations is appropriate for non-executory oral contracts. See John H. Kolb & Sons, Inc. v. G & L Excavating, Inc., 821 A.2d 774, 780 (Conn. App. Ct. 2003). In the plaintiffs' view, their contract with Heinemann was not executory, and therefore subject to the longer limitations period.

11

day following TyMetrix's sale.  See Presidential Capital, 652 A.2d at 493 (explaining that when a contract term is missing, the court must supply a term that is reasonable under the circumstances); Restatement (Second) of Contracts § 204 ("When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.").

With the contract so understood, the plaintiffs' promissory estoppel claim accrued no earlier than September 2, 2003, the day after the sale that was not a weekend or holiday.  The plaintiffs' claim was therefore filed within the limitations period.

Heinemann next argues that the promissory estoppel claims must fail because they are based on oral agreements.  Heinemann points to the integrations clause in the plaintiffs' written employment contracts, and he argues that this clause made it unreasonable for the plaintiffs to rely on his oral promises.

This argument fails.  Each integration clauses specifically stated that it contained the entire employment agreement between <u>the parties to that agreement</u>.  Heinemann, in his individual capacity, was not a party to either agreement.  Instead, both agreements were entered into between the plaintiffs and TyMetrix.  A jury could find it reasonable for Zielinski and Doyle to believe they could maintain an oral contract with Heinemann <u>personally</u>, even if it would be unreasonable for them to maintain such an agreement with TyMetrix.

Heinemann also baldly suggests that it is simply unreasonable for a person to rely on a representation that he would receive $1 Million at some undefined future point,

12

and based on an event that might never occur. Defendant's Mem. in Support of Summary Judgment at 27-28. But this argument falls short. At their depositions, both Zielinski and Doyle described how Heinemann was a man of his word, and how he always did what he said he was going to do. Additionally, Bennitt explained that, at least in the early days of TyMetrix, employees understood that Heinemann had a reputation for creating companies and then selling them. Bennitt Dep. at 67. In these circumstances, a jury could conclude that any reliance by Zielinski and Doyle was reasonable. Although there was uncertainty as to whether Heinemann would ever sell the company, a person in the plaintiffs' position could reasonably take that risk on the understanding that, if the company did get sold, the person would obtain a handsome payout.

As a final argument against the plaintiffs' promissory estoppel claims, Heinemann contends that his promises were not sufficiently clear and definite. This argument lacks traction when applied to Zielinski's claim.[9] In the promissory estoppel context, although a promise must be "clear and definite" to be enforceable, "it need not be the equivalent of an offer to enter into a contract." Stewart, 837 A.2d at 742. Indeed, a promise can be "clear and definite" for promissory estoppel purposes when it is made in exchange for vaguely defined consideration, or even for no consideration at all. See id. Understood as such, Heinemann's promise to Zielinski was clear and

---

[9] In his Memorandum, Heinemann appears to recognize that this objection is insufficient to derail Zielinski's claim, as he only makes this argument with regard to Doyle. See Defendant's Mem. in Support of Summary Judgment at 32-35.

definite: he promised to pay Zielinski $1 million after the company was sold.[10] Zielinski's promissory estoppel claim survives summary judgment.[11]

In Doyle's case, however, Zielinski's promises to her were too indefinite to give rise to a valid claim. To the extent that Heinemann stated that the employees would be "well taken care of" upon the sale of the company, and that they "didn't have anything to worry about," his statements were extraordinarily vague. Also quite vague were Heinemann's remarks to Doyle (and others) that he would make them millionaires, as these promises were highly uncertain as to the timing of Heinemann's obligation to pay, the specific amount to be paid, and the specific circumstances under which Doyle would be entitled to the money. Heinemann's statements to Doyle hardly "reflect[ed] a present intent to commit . . . as opposed to expressions of intention, hope, desire or opinion." Id. at 742-43.[12]

---

[10] Moreover, a jury could conclude that Zielinski relied on that promise. There is evidence in the record that Zielinski was concerned about TyMetrix's lack of a retirement plan, and that he had investigated other employment possibilities. A jury could conclude that Zielinski turned down those other opportunities, despite TyMetrix's lack of a retirement plan, in reliance on Heinemann's promise.

[11] The court notes that Heinemann has made no argument that Zielinski's promisory estoppel claim fails to meet the fourth element (i.e. that enforcement of the promise is necessary to avoid injustice).

[12] In their brief, plaintiffs do not contend that the promises Doyle recalled, and which were discussed above, were sufficiently clear and definite to be enforceable. However, plaintiffs do argue that Heinemann's promises to specifically pay $1 Million dollars were clear and definite. Plaintiffs' Mem. in Opposition to Summary Judgment at 28-29. Plaintiffs further argue that, even though Doyle could not recall that specific promise ever being made to her, there is evidence in the record from others who overheard that promise made to Doyle. See id. at 8-9.
The court agrees with plaintiffs that a jury could conclude that Heinemann made a specific $1 million dollar promise to Doyle. However, that does not help Doyle's promissory estoppel claim because there is no evidence that she relied on that specific

14

C. Fraud

The plaintiffs' remaining claim is for common law fraud. In Connecticut, a common law fraud claim has four required elements: (1) a false representation was made as a statement of fact; (2) the statement was known to be untrue by the speaker; (3) the statement was made to induce the listener to act upon it; and (4) the listener detrimentally relied upon the statement. Weisman v. Kaspar, 661 A.2d 530, 533-34 (Conn. 1995). The first three elements of a fraud claim are not subject to the normal preponderance of the evidence standard. Instead, the party asserting a fraud claim must prove these elements by a higher standard of "clear and satisfactory" or "clear, precise and unequivocal" evidence. Id. at 534 (quoting Rego v. Conn. Ins. Placement Facility, 593 A.2d 491, 491 (Conn. 1991) and Kilduff v. Adams, Inc., 593 A.2d 478, 486 (Conn. 1991)) (internal quotation marks omitted); see also Kilduff, 593 A.2d at 485 n.14 (explaining the policy justifications behind this enhanced evidentiary burden).

The plaintiffs' fraud claim fails on the second element. When an individual promises to perform a future act, and he then fails to perform that act, the promise is only actionable as a fraud if the individual made his promise "with a present intent not to fulfill the promise." Paiva v. Vanech Heights Constr. Co., 271 A.2d 69, 71 (Conn. 1970); see also Restatement (Second) of Torts § 530(1) (1977) ("A representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention."); id. § 530 note (identifying Connecticut as among the "great majority" of American jurisdictions that follow this Restatement rule). Fraudulent intent

---

promise. Indeed, it is hard to see how Doyle could show that she relied on a specific promise that, as far as she remembers, never took place.

15

"cannot be established by proof of [a promisor's] nonperformance only, nor does [the promisor's] failure to perform an agreement throw upon him the burden of showing that his nonperformance was due to reasons which operated after the agreement was entered into." Flaherty v. Schettino, 70 A.2d 151, 153 (Conn. 1949); see also Restatement (Second) of Torts § 530 cmt. d (1977) (same).

Plaintiffs have not presented sufficient evidence to allow a jury to conclude, by "clear and satisfactory" evidence, that Heinemann knew he was never going to pay the plaintiffs $1 Million upon the sale the company. The plaintiffs merely point to the fact that Heinemann frequently made the million dollar promise, the fact that the promise was not performed, and the fact that following the sale of the company, Heinemann told Bennitt that he had only rewarded the people he thought deserved to be rewarded. Plaintiffs' Opposition to Summary Judgment at 31-32. This evidence does nothing to identify when Heinemann decided not to pay them a million dollars, and thus there is no evidence to establish that Heinemann's promise was fraudulent when made. The fraud claim must therefore be dismissed.

IV. **CONCLUSION**

The defendant's Motion for Summary Judgment [Doc. No. 46] is **GRANTED IN PART AND DENIED IN PART**. Zielinski's promissory estoppel claim against Heinemann remains in the case. Judgment will enter for the defendant on all other claims.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 21st day of May, 2008.

        /s/ Janet C. Hall
    Janet C. Hall
    United States District Judge